# United States Tax Court

T.C. Memo. 2024-111

JACKSON CROSSROADS, LLC, GREENCONE INVESTMENTS,
LLC, TAX MATTERS PARTNER,
Petitioner

v.

COMMISSIONER OF INTERNAL REVENUE,
Respondent

LONG BRANCH INVESTMENTS, LLC, GREENCONE
INVESTMENTS, LLC, TAX MATTERS PARTNER,
Petitioner

v.

COMMISSIONER OF INTERNAL REVENUE,
Respondent

————

Docket Nos. 12235-20, 12249-20.          Filed December 19, 2024.

————

*David D. Aughtry* and *Jasen D. Hanson*, for petitioner in Docket No. 12235-20.

*David D. Aughtry* and *Jasen D. Hanson*, for petitioner in Docket No. 12249-20.

*Scott A. Hovey*, *Alden Di Ianni-Morton*, *Ryan A. Ault*, *Kyle G. Lydy*, *Clifford E. Howie*, *Jessica L. Leach*, *Ka Tam*, *Amanda K. Bartmann*, *Nina P. Ching*, and *Olivia H. Rembach*, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION

WEILER, *Judge*: These consolidated cases both involve noncash charitable contribution deductions claimed for 2016, the tax year at

[*2] issue. By separate Notices of Final Partnership Administrative Adjustment (FPAAs) respondent disallowed charitable contribution deductions claimed by Jackson Crossroads, LLC (Jackson Crossroads), and Long Branch Investments, LLC (Long Branch and, collectively, Partnerships), for their grants to the Oconee River Land Trust (Oconee Trust) of perpetual conservation easements over two adjoining pieces of land, consisting of approximately 229 and 307 acres of real property located in Morgan and Walton Counties, Georgia. After concessions[1] the issues remaining for decision are: (1) whether the Partnerships satisfied the requirements of section 170 for their claimed charitable contributions;[2] (2) the fair market values (FMVs) of the two conservation easements; and (3) whether any number of penalties under sections 6662(b), (c), (d), (e), and (h) and/or 6662A are applicable.

We hold that the Partnerships have satisfied the requirements of section 170. Jackson Crossroads is entitled to a charitable contribution deduction of $1,169,797 for tax year 2016, and Long Branch is entitled to a charitable contribution deduction of $1,571,226 for tax year 2016. With respect to penalties, we find each Partnership liable for the 40% gross valuation misstatement penalty since the FMVs claimed exceed the FMVs determined herein by more than 200%. *See* I.R.C. § 6662(a), (h).

FINDINGS OF FACT

Some of the facts are stipulated and are so found. The Stipulations of Facts and the attached Exhibits are incorporated herein by this reference.

---

[1] By way of Stipulations of Settled Issues the parties agree that the conservation easements at issue satisfy one of the conservation purposes defined in section 170(h)(4) and that respondent has complied with the procedural requirements set forth in section 6751(b) for all penalties asserted under sections 6662 and 6662A. Unless otherwise indicated, statutory references are to the Internal Revenue Code, Title 26 U.S.C. (I.R.C. or Code), in effect at all relevant times, regulation references are to the *Code of Federal Regulations*, Title 26 (Treas. Reg.), in effect at all relevant times, and Rule references are to the Tax Court Rules of Practice and Procedure.

[2] On brief respondent contends the Partnerships have each failed to make qualifying charitable contributions, since: (i) they failed to obtain a qualified appraisal; (ii) they failed to retain a qualified appraiser (with respect to Jackson Crossroads only); and in the alternative, (iii) their contribution amounts are limited to their adjusted bases because the properties were inventory items in the hands of Mor-Ton and disposed of within five years.

[*3] The Partnerships are both treated as partnerships subject to the Tax Equity and Fiscal Responsibility Act of 1982 (TEFRA), Pub. L. No. 97-248, §§ 401–407, 96 Stat. 324, 648–71. For federal income tax purposes petitioner Greencone Investments, LLC (Greencone), is the tax matters partner for both Partnerships.[3] Carlton K. Walstad and Russell Bennett are the owners and designated representatives of Greencone. Both of the Partnerships are Georgia limited liability companies with their principal places of business in Marietta, Georgia.

I.    *Relevant History of Mr. Walstad, Mr. Bennett, and Greencone*

While attending the University of Georgia Mr. Walstad held a real estate license and worked as a real estate broker with REMAX. After college Mr. Walstad worked for a timber investment management company which purchased and sold various portions of land, and he helped to develop the company. In his roles as a real estate broker and an employee of the timber company Mr. Walstad used the sales comparison approach and the income capitalization approach, including the discounted cashflow (DCF) analysis, to value land. In tax year 2014 Mr. Walstad's adjusted gross income had grown exponentially, and he claimed a charitable contribution deduction of more than $2.6 million which principally comprised 61 separate donations of land, both fee simple and easements, for conservation purposes.

Mr. Walstad met Mr. Bennett while attending the University of Georgia. Mr. Bennett also held a real estate license and worked as a real estate professional developing residential lots in the Atlanta metro area for homebuilders including Pulte Del Webb. However, Mr. Bennett was laid off in 2008 because of the economic downturn; he then turned to farming for several years as a source of income. Mr. Bennett then became interested in and undertook the conservation of land, including farming lands.

In the summer of 2011 Mr. Bennett bumped into Mr. Walstad at an Atlanta Braves baseball game. They discussed their mutual work endeavors in land conservation, and beginning in 2012 Messrs. Walstad and Bennett began working together on land conservation including syndicated conservation easement donations. They began conducting their business operations through Greencone. Before tax year 2016 Messrs. Walstad and Bennett, through Greencone, acquired land,

---

[3] Before its repeal TEFRA governed the tax treatment and audit procedures for many partnerships, including Jackson Crossroads and Long Branch.

[*4] including agriculture lands in Kentucky and Georgia, for the purpose of creating conservation easements.

II.    *The Subject Properties and Ownership History*

On October 17, 2015, Mr. Walstad formed Mor-Ton, LLC (Mor-Ton), with Greencone initially holding an 80% membership interest and serving as the managing member.

On October 19, 2015, Mr. Walstad entered into a contract to purchase a tract of land consisting of approximately 604 acres which straddled Walton and Morgan Counties for $3 million from a third party. On October 30, 2015, Mr. Walstad entered into a contract to purchase the neighboring tract of land consisting of approximately 321 acres for $2.2 million from a third party. Mr. Walstad assigned these two purchase agreements to Mor-Ton on November 16, 2015, and then on November 24, 2015, Mor-Ton acquired both properties, totaling 925.63 acres, for a total price of $5.2 million. A portion of the $5.2 million acquisition price was financed by AgSouth Bank Farm Credit, ACA (AgSouth). As part of the AgSouth loan due diligence process a third-party appraisal was performed by Parker Property & Appraisals, Inc. Using the sales comparison approach to value the two tracts of land in question, this appraisal concluded the two properties were valued at the same price as the total of the purchase agreements; namely, $5.2 million.

On January 13, 2016, Mor-Ton formed Jackson Crossroads and Long Branch, and on June 30, 2016, Mor-Ton transferred its membership interests in the Partnerships to the members of Mor-Ton proportionately with the members' ownership interests in Mor-Ton. At the time of the transfer Greencone held a majority interest in Mor-Ton and therefore received a majority interest in the Partnerships.[4] Mor-Ton subdivided the two properties it acquired in 2015 into four parcels of land, and Mor-Ton transferred one parcel consisting of 228.61 acres to Jackson Crossroads on June 30, 2016, and transferred the adjoining second parcel consisting of 307.06 acres to Long Branch on July 6, 2016.

---

[4] Other members of Mor-Ton which received ownership interests in the Partnerships included: Moore Creek Consulting, LLC; J Matthews Consulting, LLC; Bennett OSS, LLC; and MProp Investments, LLC.

[*5] III.    *The Conservation Easement Transactions*

On or around April 12, 2016, Mor-Ton retained Black Rock Consulting, LLC (Black Rock), to drill and analyze the Jackson Crossroads and Long Branch properties for any potential mineral interests. Black Rock provides mining engineering consulting services for large construction aggregate producers as well as private landowners throughout Georgia and other parts of the United States.

Beginning in April 2016 and ending in May 2016 Black Rock conducted drilling on the Partnerships' properties as well as on the two neighboring parcels. Three drillholes were made on the Jackson Crossroads property, and three drillholes were made on the Long Branch property. Only the drillholes made on the Jackson Crossroads property struck granite rock. Black Rock, therefore, made the initial conclusion that surface mining of granite rock for sale as construction aggregate was feasible only at the Jackson Crossroads property.

A.    *The Jackson Crossroads Property*

Mr. Walstad, on behalf of Mor-Ton, retained Dr. Paul A. Schroeder, a registered professional geologist, to evaluate the Jackson Crossroads property and prepare a written report. On the basis of his geological examination of the property and Black Rock's on-site drilling on the property, Dr. Schroeder concluded the underlying bedrock was primarily composed of Lower Paleozoic metamorphic granitic gneiss. On the basis of various testing performed on two sections of rock retrieved from one core hole, Dr. Schroeder concluded that the rock had potential for use as construction aggregate.

Dr. Schroeder's report provided a historical overview of the aggregate market in Georgia. He opined that the aggregate market in Georgia showed continued growth and "[a]s demand for aggregate products improves, the prospects of opening a quarrying business on the [Jackson Crossroads] property will become more attractive." He indicated that "[w]ith further favorable testing of rock cores from this site, this property could potentially be developed as an aggregate quarry."

[*6] Black Rock also prepared a development assessment written report related to the Jackson Crossroads property. This Black Rock report considered the property, the geology of the rock from the drillholes, regulatory requirements, market conditions, competitors, and site development and concluded that the property offers potential as a site for the development of a construction aggregate mine and a stone processing facility. The report also furnished a 20-year pit development plan as follows:



| Jackson Crossroads Proposed Quarry Walton Co., GA | Project No160103 Design By: NA Drawn By: CB Checked By: DB Date: 09/10/16 Scale: 1"=750' | FIGURE 15 20-Yr Pit Development | BLACK ROCK CONSULTING, LLC Seven Dunwoody Park, Suite 115 Atlanta, Georgia 30338 (P) 770.395.6111 (F) 770.395.6999 |

Docket Nos. 12235-20 and 12249-20
Exhibit 404-P
Page 43 of 73

The report performed a financial assessment and included a projected income statement for a proposed quarry on the property. However, the report also indicated that the assessment was "intended as a general review, with further analyses required based on more

[*7] complete site planning, equipment specification and proposed business structure." The report further acknowledged that mining and production of construction aggregate is a competitive industry and noted barriers to entry into the market including high capital costs, challenging government regulations, and well-established competitors that enjoy the advantage of economies of scale.

Mr. Walstad, on behalf of Greencone, retained Robert Fletcher, a certified general real estate appraiser who is licensed in Alabama, Georgia, Tennessee, and North Carolina and who holds a CCIM designation. Mr. Fletcher initially performed a restricted appraisal report on the Jackson Crossroads property dated September 29, 2016. Mr. Fletcher's restricted appraisal concluded the highest and best use of the property "would be for the extraction of stone products via a quarry and processing facility . . . subject to permission by Walton County relative to zoning issues." Relying heavily upon the Black Rock report, including the estimated costs of operations, gross sales, and unit prices of aggregate materials mined from the property, Mr. Fletcher reached a before easement FMV of $23,609,178 and an after easement FMV of $570,000, resulting in a net conservation easement FMV of $23,039,178.

Mr. Fletcher also performed a full FMV appraisal of the Jackson Crossroads property in 2017 with an effective date of December 19, 2016. He again concluded the highest and best use for the Jackson Crossroads property before the granting of a conservation easement was as an aggregate quarry mine and processing facility, and the highest and best use for the property after the granting of the easement was passive recreational, forestry, and agricultural uses. Like his restricted report and on the basis of significant reliance on the Black Rock report and other reports and articles, Mr. Fletcher concluded the income capitalization approach to value the property was appropriate, and he calculated a before easement FMV of $23,584,336. Mr. Fletcher used the sales comparison approach to calculate an after easement FMV of $441,915, resulting in a net conservation easement FMV of $23,142,421.

B.    *The Long Branch Property*

In June 2016 Mr. Walstad retained architect J. Bruce Macgregor to design a bulk industrial distribution park on the Long Branch property. Mr. Macgregor provided an initial conceptual design plan for a proposed industrial development of the Long Branch property. However, on the basis of feedback received from Scott Gardner, an

[*8] engineer with Eberly & Associates, Mr. Macgregor revised his design to account for wetland streams on the property.

The revised design, dated September 1, 2016, consists of a cover page, a site design narrative, and a master plan site design as follows:



The revised report indicated the design sought to minimize the impact of the wetland streams located on the property. However, in his report Mr. Macgregor acknowledges that he did not perform an investigation as to the current availability of utilities at the Long Branch property.

Mr. Walstad, on behalf of Long Branch, then retained George P. Galphin, Jr., a Certified General Real Estate Appraiser licensed in Georgia and a member of the Appraisal Institute (MAI), who performed an appraisal report on the Long Branch property dated March 13, 2017, with an effective date of December 16, 2016. Mr. Galphin's appraisal concluded the highest and best use of the property before the granting of the easement was industrial development. In forming his opinion of FMV Mr. Galphin employed extraordinary assumptions[5] and

---

[5] *Uniform Standards of Professional Appraisal Practice* (USPAP) defines an extraordinary assumption as "an assumption, directly related to a specific assignment, as of the effective date of the assignment results, which, if found to be false, could alter

**[\*9]** hypothetical conditions including that the property could be developed as presented in the site plan prepared by Mr. Macgregor and that the property could be rezoned from rural agricultural land to a "more intense industrial zoning." Mr. Fletcher's report, using the sales comparison and income capitalization approaches to value, concluded a before easement FMV for the Long Branch property of $14.6 million and an after easement FMV of $770,000, resulting in a net conservation easement value of $13,830,000.

IV.   *The Jackson Crossroads and Long Branch Planned Conservation Easements*

On August 2, 2016, Kristina Sorensen prepared a baseline documentation report on the Jackson Crossroads property, and on August 15, 2016, she prepared a baseline documentation report on the Long Branch property. The reports are to document the properties' conservation values, locations, and man-made features.

The Jackson Crossroads baseline report stated the property contained planted loblolly pine and natural hardwood forest areas as well as fields planted with soybean, chufa, corn, and wheat. The property also had two intermittent streams and two small, man-made ponds. In addition, a pole shed and dilapidated hunting camps stood on the property. The overall conservation plan was to use the Jackson Crossroads property for timber production, wildlife habitat, limited agricultural production, outdoor recreation, conservation value, and wetland protection.

Much like the Jackson Crossroads report, the baseline report for the Long Branch property classified the property as containing mostly wooded areas with mature planted loblolly pine, mixed pine and hardwood forest areas, scattered wildlife openings, a large hayfield, a tributary of Rocky Creek, and three man-made ponds. A large transmission powerline right-of-way crosses the Long Branch property. The overall conservation plan was to use the Long Branch property for timber    production,    wildlife    habitat,    limited    agricultural

---

the appraiser's opinions or conclusions." USPAP further states: "Extraordinary assumptions presume as fact otherwise uncertain information about physical, legal, or economic characteristics of the subject property; or about conditions external to the property, such as market conditions or trends; or about the integrity of data used in an analysis." Appraisal Standards Bd., Appraisal Found., *Uniform Standards of Professional Appraisal Practice* 3 (2016–2017 ed.).

[*10] production, outdoor recreation, conservation value, and wetland protection.

Jackson Crossroads conveyed a conservation easement to Oconee Trust over 228.61 acres of the Jackson Crossroads property via a deed of conservation easement. The deed is dated December 16, 2016, and was recorded on December 19, 2016, in Morgan and Walton Counties, Georgia. Similarly, Long Branch conveyed a conservation easement to Oconee Trust over 307.06 acres of the Long Branch Property, via a deed of conservation easement. The deed is dated December 16, 2016, and was recorded December 19, 2016, in Morgan and Walton Counties, Georgia.

Pursuant to separate letters both dated December 27, 2016, Oconee Trust acknowledged receipt of the conservation easement donations made by Jackson Crossroads and Long Branch.

The Forms 1065, U.S. Return of Partnership Income, for tax year 2016 for the Partnerships were prepared and signed by Madison Mongin of Bennett Thrasher. Torrie Barry, a Certified Public Accountant with the firm of Bennett Thrasher, testified at trial. She relied on the information furnished from Mr. Walstad and Mr. Bennett to prepare the Forms 1065 for both Partnerships. The Form 1065 for Jackson Crossroads was filed for the short period November 5, 2016, through December 31, 2016. The tax return included Form 8283, Noncash Charitable Contributions, signed by Mr. Fletcher, and indicated that the property contained aggregate mineral reserves on the basis of the Black Rock report. Jackson Crossroads reported a charitable contribution deduction of $23,142,421 attributable to the conservation easement placed on the Jackson Crossroads property.[6] Jackson Crossroads also included with its tax return the Oconee Trust letter, Form 8886, Reportable Transaction Disclosure Statement, and Supplement to Form 8886.

The Form 1065 for Long Branch was filed for the short period December 2 through December 31, 2016. The tax return included Form 8283 signed by Mr. Fletcher and reported a charitable contribution deduction of $13,830,000 and a cost basis of $1,797,615 attributable to

---

[6] The record in these cases contains two Forms 8283 for Jackson Crossroads for the short period November 5 through December 31, 2016. One of the Forms 8283 lists Jackson Crossroads' basis in the property as $1,305,686; the other Form 8283 lists Jackson Crossroads' basis in the property as $1,330,619. Jackson Crossroads' basis in the property is immaterial in resolving these cases.

**[\*11]** the conservation easement placed on the Long Branch property. Long Branch also included with its tax return the Oconee Trust letter, Form 8886, and Supplement to Form 8886.

V.     *Expert Testimony Presented at Trial*

   A.     *Testimony Relating to the FMV of the Jackson Crossroads Property*

At trial the parties offered expert witness testimony regarding the Jackson Crossroads property's hypothetical legally permissible use as a mine on the basis of conceptual design plans, its access to nearby utilities and rail, and a financial feasibility study. Below we will discuss this evidence presented considering the Jackson Crossroads property's highest and best use and its FMV both before and after the granting of the conservation easement of December 19, 2016.

   1.     *Jackson Crossroads Property's Highest and Best Use*

Jackson Crossroads offered expert witness testimony from Nick Proctor, a registered professional geologist and director of consulting services with Burgex Mining Consultants (Burgex). He was accepted by the Court as a mining consultant expert. Mr. Proctor performed a market study and project evaluation, and using a DCF analysis he derived a before easement FMV of $18,622,000 for the Jackson Crossroads property. He opined that within a one-hour drive from the Jackson Crossroads property there were an estimated 2.8 million residents and an estimated demand for 21.7 million tons of aggregate material with a supply of only 5.3 million, resulting in a deficit and unmet demand of more than 16 million tons of aggregate. He further opined there was an indicated resource at the Jackson Crossroads site, and he recommended a study be undertaken to convert the indicated resource into a reserve.[7]

Jackson Crossroads also offered testimony from Benjamin R. Black, a principal geological engineer with GeoLogic, LLC. He was accepted by the Court as an expert in geology and mining engineering.

---

[7] According to guidelines from the Society for Mining, Metallurgy, and Exploration, a "Mineral Resource is a concentration or occurrence of solid material of economic interest in or on the Earth's crust in such form, grade, or quality and quantity that there are reasonable prospects for eventual economic extraction," while a "Mineral Reserve is the economically mineable part of a Measured and/or Indicated Resource." A Mineral Reserve is that portion of a Mineral Resource which can "be the basis of an economically viable project after taking account of all relevant Modifying Factors."

**[\*12]** Mr. Black opined on the basis of the Proctor report that a final probable mineral reserve of 5,529,000 short tons and a proven mineral reserve of 4,171,000 short tons for a total of 9.7 million short tons of aggregate was available at the Jackson Crossroads property. Mr. Black also performed a market study and project evaluation of the property site. He prepared a plan and design calling for a two-pit quarry on the property site as follows:



[*13]



Finally, as part of his analysis he reviewed the permitted mines within an approximate 50-mile radius from the Jackson Crossroads property. He found that testing samples from the property compare closely to samples from 29 other mines which were permitted with and actively producing aggregate qualified by the State of Georgia Department of Transportation for transportation projects.

Jackson Crossroads offered testimony from Justin Norton, principal of Norton Consulting, Inc., to analyze and opine on the market conditions and potential development of Jackson Crossroads property for industrial use as of December 2016. Mr. Norton was accepted by the Court as an expert in researching real estate markets with special emphasis on industrial markets. He considered the local and regional economic indicators and found that they support industrial development after considering the current and anticipated industrial companies within the Jackson Crossroads local market area, including the Joint Development Authority of Covington, Walton, and Morgan Counties. Mr. Norton concluded the Jackson Crossroads property, because it was situated within an industrial corridor and was near other industrial mega sites, was well positioned for future development as an industrial site in 2016.

[*14] Jackson Crossroads offered testimony from Barry A. Fleming, an attorney with Fleming & Nelson, LLP. Mr. Fleming was recognized by the Court as an expert in zoning applications for the Jackson Crossroads and Long Branch properties. On the basis of discussions with local officials in Walton and Morgan Counties Mr. Fleming concluded that in December 2016 there was a strong probability that a zoning application for a distribution center at either of the Partnerships' properties would be approved. Finally, Mr. Fleming opined that in December 2016 there was a strong probability that a zoning application made for a mining operation on the Jackson Crossroads property would be approved.

In rebuttal respondent offered expert witness testimony from Berkley Tracy, a geologist and principal consultant in resource geology with SRK Consulting (U.S.), Inc. Mr. Tracy was accepted by the Court as an expert in mineral exploration, geology, and mineral resource estimating. He explained the relationship between a mineral resource and a mineral reserve and cited the following diagram:



Source: modified after SME, 2014

_____

**[*15]** Before declaring a "mineral reserve" present at a property, several modifying factors are to be considered, including quality, transportation, cost to markets, location and quality of competing deposits, and ability to compete for access to the market. Mr. Tracy opined that a reasonable amount of additional drilling would be needed before declaring a reserve at the Jackson Crossroads property including an additional 5 to 10 holes laid out in a gridlike manner with spaces less than 250 feet apart as follows:





Figure 4-5: Example Drillhole Grid Map

Source: SRK, 2023
Note: Green line is approximate property boundary. Blue dots are drillholes from the Black Rock report. Blue and red lines are Pit 1 and Pit 2, respectively, from BRC. An approximate drillhole grid is shown for illustrative purposes with pink (about 250 feet spacing) and green (about 500 feet spacing) dots.

He went on to opine that while only limited drilling has occurred at the Jackson Crossroads site, it indicated the property had the potential to be a quarry site. However, the drilling was inadequate to estimate the quality variation within the mineral deposit onsite and to prove its economic viability.

In rebuttal respondent also offered expert witness testimony from Kevin Gunesch, a mining engineer and principal consultant in mining engineering with SRK Consulting (U.S.), Inc. Mr. Gunesch was accepted by the Court as an expert in mining engineering and mineral resource and reserve evaluation. He concluded that a mining operation was not financially feasible on the Jackson Crossroads property. When undertaking a base case scenario for a hypothetical quarry on the property and using a production amount of 300,000 tons of aggregate annually at prices between $17.25 and $20.25 per ton, he opined that such a scenario would result in a cashflow of negative $16,889,772 and

**[*16]** a net present value of negative $24,659,891, making the mining operation unfeasible in his opinion.

2. *Value of the Jackson Crossroads Property Before the Granting of a Conservation Easement*

Jackson Crossroads offered expert witness testimony from Douglas Kenny, an MAI appraiser with Kenny and Associates, Inc. Mr. Kenny was accepted as an expert in real estate appraisals for both industrial and mining properties.

In his opinion the FMV of the Jackson Crossroads property as of December 19, 2016, on the basis of a highest and best use as a mining development, was $19,180,000. His research, which was reinforced by the drill testing and geological testing performed by Burgex, led Mr. Kenny to conclude that the property has the potential to be a crushed stone mine.

In forming his opinion of value for the Jackson Crossroads property, Mr. Kenny used the income approach to value, and more specifically he performed a DCF analysis, to arrive at an FMV as of December 2016 of $19,189,377. When conducting his DCF analysis for a hypothetical quarry on the property Mr. Kenny used a production amount ranging from 272,000 tons sold in year 3 to 688,000 tons in year 20 with prices ranging from $16.52 per ton in year 3 to $27.30 per ton in year 20, resulting in a negative cashflow through year 2 but net annual income thereafter of $1.3 million to $7.2 million and a net present value of more than $19 million.

Respondent offered expert witness testimony from Andrew Sheppard, an MAI appraiser and principal with Pritchett, Ball & Wise, Inc. Mr. Sheppard was recognized as an expert in real estate and the appraisal of real property.

After considering all three approaches to value Mr. Sheppard used the sales comparison approach to determine the FMV of the Jackson Crossroads property. Using as comparables five properties which range in size from 185 to 487 acres and with transactions dates between August 2015 and December 2017, he arrived at a value of $7,000 per acre for a total rounded value of $1.6 million for the Jackson Crossroads property.

On the basis of his research Mr. Sheppard concluded there was little evidence supporting the contention that the Jackson Crossroads

[*17] property could receive zoning and permitting to operate as a mine. He further concluded that the most reasonable and likely use for the property was agricultural or other passive use with low-density residential or solar paneling. Mr. Sheppard also noted the most relevant physical characteristic affecting the highest and best use of the Jackson Crossroads property was that the sole road access to the property was a graded railroad crossing with no safety functionalities or signage.

Mr. Sheppard did consider a hypothetical highest and best use of the Jackson Crossroads property as a mine, but he considered the previously conducted mineral exploration to be minimal, with inconclusive results. He also opined that it would be inappropriate and contrary to the principles of mineral valuations to appraise an exploratory-stage mineral property as if it were a going business concern because only the worth of the real property is being donated. Mr. Sheppard concluded that for the Jackson Crossroads property an appraisal should include only the value of the unentitled land and should not include the value of any future sales or future business profits from a nonexistent mining business. Any conclusion stating the value of the property to be anything above the value of the unentitled land would be unrealistic and illogical.

Respondent also offered expert witness testimony from Raymond H. Krasinski, an MAI appraiser working for the Internal Revenue Service (IRS). Mr. Krasinski was accepted by the Court as an expert in real property appraisal, real property appraisal review, and the Uniform Standards of Professional Appraisal Practice (USPAP). He reviewed the appraisal report prepared by Robert Fletcher. Mr. Krasinski noted that Mr. Fletcher failed to include and analyze sales occurring in Morgan and Walton Counties between years 2010 and 2016 and thereby failed to comply with USPAP, and his use of DCF analysis to value the Jackson Crossroads property also violated USPAP. Mr. Krasinski concluded that the highest sale in the two counties after considering some 181 sales was $11,693 per acre, and he opined that a sale at $103,000 per acre—as concluded by Mr. Fletcher—had a 0% probability. Mr. Krasinski further stated that Mr. Fletcher's report was misleading because of errors he committed under USPAP. In sum, Mr. Krasinski opined that the data and DCF analysis used in Mr. Fletcher's report did not produce an FMV for the Jackson Crossroads property that could be corroborated by market conditions, and his report is therefore not credible.

**[\*18]**     3.     *Value of the Jackson Crossroads Property After the Granting of a Conservation Easement*

To form his opinion of the after easement FMV for the Jackson Crossroads property, Mr. Kenny used the sales comparison approach. He selected six comparable properties which were all located in Alabama and Georgia, were encumbered with conservation easements, and ranged in size from 64 to 242 acres. Mr. Kenny arrived at an average price per acre of $1,600 and a rounded value of $365,000 for the Jackson Crossroads property after the granting of the conservation easement.

To calculate the after easement value of the Jackson Crossroads property Mr. Sheppard used the sales comparison approach and selected five properties with similar conservation easements as comparable properties. He opined that as of December 19, 2016, the after easement FMV of the property was $460,000 total or $2,000 per acre.

B.     *Testimony Relating to the FMV of the Long Branch Property*

At trial the parties offered expert witness testimony regarding the Long Branch property's hypothetical legally permissible industrial use including conceptual design plans, its access to nearby utilities and rail, and financial feasibility on the basis of neighboring industrial developments. Below we will discuss the evidence presented in considering the Long Branch property's highest and best use and the property's FMV both before and after the granting of the December 19, 2016, conservation easement.

1.     *The Long Branch Property's Highest and Best Use*

Long Branch offered expert testimony from Ralph Forbes, P.E., vice president and regional director at Thomas & Hutton. Mr. Forbes was recognized at trial as an expert in civil engineering for industrial development projects. He performed a "desktop review" of the development of the Long Branch property for industrial use and concluded that access to the property would require either an at-grade crossing or an elevated bridge crossing over the CSX railway. Mr. Forbes's report also discussed the property's proximity to utilities, including water, sewer, gas, and electricity, and what (if anything) would be required for access to utilities. Below is Mr. Forbes's conceptual masterplan for the development of the Long Branch property for industrial use:

[*19]



Mr. Forbes concluded that development of the Long Branch property would be enticing for both manufacturing and distribution because of the property's proximity to Interstate 20, CSX rail, and other industrial developments. He encouraged a deeper review into the potential development of the property.

Like Jackson Crossroads, Long Branch hired Mr. Norton to analyze the market conditions and potential development of the Long Branch property for industrial use as of 2016 and provide a retrospective report. As in his analysis for the Jackson Crossroads property, he considered local and regional economic conditions which support industrial development, including the Joint Development Authority of Covington, Walton, and Morgan Counties and the current and anticipated industrial companies within the Long Branch local market area. Mr. Norton concluded that the Long Branch property, because it was situated within an industrial corridor and near other industrial mega sites, was well positioned for future development as an industrial site in 2016.

Like Jackson Crossroads, Long Branch offered expert witness testimony from Mr. Fleming. On the basis of his discussions with local officials in Walton and Morgan Counties Mr. Fleming opined there was

**[\*20]** a strong probability that in December 2016 the Long Branch property would receive any necessary rezoning and permitting from both Walton and Morgan Counties to establish an industrial distribution center onsite.

In rebuttal respondent offered expert testimony from Laura Smith of GAI Consultants, Inc. She was recognized as an expert in market demand and market feasibility.

On the basis of her market demand and market feasibility analysis Ms. Smith concluded that the proposed industrial development of the Long Branch property as a possible site for a manufacturing or distribution center was "overly optimistic" in consideration of conditions in the market that existed through 2016. Her overall conclusions were based on lack of both market demand and market feasibility at the property. Lastly, Ms. Smith concluded that development of the property lacks feasibility on the basis of quantitative factors including flat regional population and employment growth in Morgan, Walton, and Newton Counties, transportation access deficiencies adjacent to the property (including both trucking and rail), and overall lack of demand for industrial space in her defined market area.[8]

Also in rebuttal respondent offered expert testimony from Harvey Crouch, a professional engineer with Crouch Engineering. He was recognized as an expert in railway engineering. Mr. Crouch reviewed the site design narrative prepared by Mr. Macgregor for the Long Branch property and determined it was not feasible, was not accurate, and did not characterize the site conditions fully or appropriately regarding site topography, environmental conditions, and CSX railroad guidelines to appropriately design and gain approval for new industrial railroad tracks (or "railway access spur") accessing the property. He also concluded construction of a new railroad access spur onto the Long Branch property would cost between $14 and $17 million.

Mr. Crouch later opined that Mr. Macgregor's site design narrative failed to include a proposed railroad grade crossing or a grade separated crossing (i.e., a bridge) onto the property from Dixie Highway. Mr. Crouch concluded that approval for a public grade crossing would be difficult to obtain from CSX; alternatively, petitioner's proposed

---

[8] In rebuttal to Ms. Smith, Long Branch offered testimony from Mr. Norton. His rebuttal testimony addressed the key areas of opinion offered by Ms. Smith and noted what he considered to be critical errors she made in her opinion.

[*21] grade separated crossing (or bridge) was neither specific to nor feasible for accessing the Long Branch property. Lastly, Mr. Crouch opined that, using historical pricing, a railroad grade crossing would cost $615,585, while a grade separated crossing would cost $2,342,500.

2. *Value of the Long Branch Property Before the Granting of a Conservation Easement*

Long Branch also offered expert witness testimony from Mr. Kenny. In his opinion the FMV of the Long Branch property as of December 19, 2016, on the basis of a highest and best use as an industrial development was $13,815,000. Because of projected demand within the subject property area, Mr. Kenny determined industrial development at the Long Branch property would have been the maximum productive use of the property. In reaching his conclusion he assumed that no zoning restrictions existed which would have prevented industrial use of the property.

In forming his opinion of FMV Mr. Kenny used the sales comparison approach and selected four comparable properties which were located in Jackson, Fulton, Morgan, and Henry Counties in Georgia and ranged in size from 62 to 183 acres. Three of the four properties used as comparables were zoned industrial at the time of their sales in 2014. After considering these comparables and after making adjustments, he concluded that a sale price of $45,000 per acre or a rounded price of $13,815,000 for the total property was reasonable and supported.

In rebuttal respondent offered testimony from Mr. Sheppard. He concluded that the highest and best use was agricultural, low density residential, or recreational use. Using the sales comparison approach to value the Long Branch property and choosing five properties of vacant land as comparables on the basis of similar proximity to a highway and with sale dates ranging from 2015 to 2017, Mr. Sheppard determined an FMV of $7,000 per acre or $2,150,000 total.

3. *Value of the Long Branch Property After the Granting of a Conservation Easement*

It was Mr. Kenny's opinion that the Long Branch property, which was subject to a conservation easement as of December 19, 2016, was worth $365,000. In rebuttal respondent again offered testimony from Mr. Sheppard. To value the Long Branch property after the conservation easement Mr. Sheppard again used the sales comparison

[*22] approach and selected five properties with similar conservation easements as comparable properties. He opined that as of December 19, 2016, the FMV of the encumbered property was $2,000 per acre or $615,000 total.

OPINION

I.  *Burden of Proof*

Ordinarily, the taxpayer bears the burden of proving that the Commissioner's determinations are erroneous.[9] Rule 142(a); *Welch v. Helvering*, 290 U.S. 111, 115 (1933). That burden includes proving entitlement to any deductions claimed. *See INDOPCO, Inc. v. Commissioner*, 503 U.S. 79, 84 (1992); *New Colonial Ice Co. v. Helvering*, 292 U.S. 435, 440 (1934). Petitioner therefore generally bears the burden of proving the Partnerships' entitlement to the claimed charitable contribution deductions for qualified conservation easement contributions under section 170 as well as the burden of proving the value of the conservation easements.

In order to establish the Partnerships' entitlement to the charitable contribution deductions at issue petitioner must show (1) the Partnerships each made qualifying contributions; (2) they satisfied (or are excused from) the substantiation requirements for those contributions; and (3) the values of the contributions. *See Murfam Enters. LLC v. Commissioner*, T.C. Memo. 2023-73, at *15. All three requirements must be met for a donation to be a qualified conservation contribution. *See Simmons v. Commissioner*, T.C. Memo. 2009-208, slip op. at 9, *aff'd*, 646 F.3d 6 (D.C. Cir. 2011).

II.  *Qualified Contributions*

Section 170(a)(1) allows a deduction for any charitable contribution made within the taxable year. The Code generally restricts a taxpayer's charitable contribution deduction for donations of "an interest in property which consists of less than the taxpayer's entire interest in such property." I.R.C. § 170(f)(3)(A). That means someone

---

[9] As to the burden of production section 7491(c) provides that the Commissioner "shall have the burden of production in any court proceeding with respect to the liability of any individual for any penalty, addition to tax, or additional amount." However, section 7491(c) does not apply to TEFRA partnership-level proceedings such as these cases. *See Dynamo Holdings Ltd. P'ship v. Commissioner*, 150 T.C. 224, 234 (2018). Therefore, petitioner bears not only the burden of proof but also the burden of production even as to any penalty.

**[\*23]** who owns property and donates to charity only a partial interest in that property may not claim a charitable contribution deduction for that donation. However, the statute provides an exception—and allows a deduction—for a "qualified conservation contribution." I.R.C. § 170(f)(3)(B)(iii). Section 170(h)(1) defines a "qualified conservation contribution" to be (1) the contribution of a "qualified real property interest" (2) to a "qualified organization" (3) "exclusively for conservation purposes." The parties agree that Oconee Trust is a qualified organization for purposes of section 170(h)(1)(B), and before trial the Court granted petitioner's Motion for Partial Summary Judgment, finding that the Partnerships each made a "qualified conservation contribution" of a "qualified real property interest."[10]

We must first decide whether the Partnerships have satisfied the substantiation requirements for such a contribution.[11]

### III. *Compliance with the Substantiation Requirements*

"A charitable contribution shall be allowable as a deduction only if verified under regulations prescribed by the Secretary." I.R.C. § 170(a)(1). Respondent argues the Partnerships' charitable contribution deductions should be disallowed in full. In support of this argument respondent contends Jackson Crossroads failed to furnish a qualified appraisal from a qualified appraiser as required under section 170(f)(11)(D). Respondent also contends the appraisal report for the Long Branch property is not a qualified appraisal.

We summarize the statutory and regulatory requirements before addressing respondent's contention that the Partnerships have failed to satisfy these requirements.

#### A. *Statutory and Regulatory Requirements*

Section 170(f)(11) imposes heightened substantiation requirements on taxpayers for charitable contribution deductions depending on the value of the contribution. Section 170(f)(11)(A)(i)

---

[10] *See* Order dated December 8, 2023 (granting, *in part*, petitioner's Motion for Partial Summary Judgment).

[11] As explained in our December 8, 2023, Order denying, *in part*, petitioner's Motion for Partial Summary Judgment, we left for trial the following issues: (1) whether Mr. Fletcher is a qualified appraiser under section 170(f)(11) and Treasury Regulation § 1.170A-13(c)(5); and (2) whether his appraisal is a qualified appraisal under section 170(f)(11) and Treasury Regulation § 1.170A-13(c)(3).

**[*24]** provides that for deductions greater than $500,000 a taxpayer must attach "a description of such property," obtain "a qualified appraisal of such property," and "attach[] to the return for the taxable year a qualified appraisal of such property." *See* I.R.C. § 170(f)(11)(B), (C), and (D).

Treasury Regulation § 1.170A-13(c)(3)(ii) provides that a "qualified appraisal" must contain, among other things, the following information: (1) a description of the property; (2) the date(s) on which the property was appraised; (3) the property's FMV; (4) the method used to value the property; and (5) the specific basis for the valuation and a justification of that basis.

Treasury Regulation § 1.170A-13(c)(3)(i)(B) provides that a qualified appraisal must be "prepared, signed, and dated by a qualified appraiser." A "qualified appraiser" must: (1) hold himself out to the public as an appraiser; (2) be qualified to make appraisals of the type of property being valued; and (3) acknowledge that aiding and abetting an understatement of tax liability may subject him to a penalty pursuant to section 6701. Treas. Reg. § 1.170A-13(c)(5)(i). Moreover, a qualified appraiser must not: (1) receive a deduction under section 170 for the contribution of the property that is being appraised; (2) have been a party to the donor's acquisition of the property being appraised; (3) be the donee of the property; (4) have been a person employed by any of the aforementioned; (5) be related to any of the aforementioned within the meaning of section 267(b) (not applicable here); or (6) be an appraiser regularly engaged by any of the aforementioned who does not make a majority of his appraisals for other persons during the taxable year. Treas. Reg. § 1.170A-13(c)(5)(iv).

### B. *Whether Mr. Fletcher Was a Qualified Appraiser*

Respondent does not contest that Mr. Fletcher satisfies the general requirements of Treasury Regulation § 1.170A-13(c)(5)(i); rather, he seeks to disqualify Mr. Fletcher as a qualified appraiser under the theory that he runs afoul of subdivision (ii) of Treasury Regulation § 1.170A-13(c)(5). The so-called knowledge regulation provides, in relevant part:

> An individual is not a qualified appraiser with respect to a particular donation . . . if the donor had knowledge of facts that would cause a reasonable person to expect the

**[\*25]** appraiser falsely to overstate the value of the donated property . . . .

Treas. Reg. § 1.170A-13(c)(5)(ii). The regulation gives the following illustration: "the donor and the appraiser make an agreement concerning the amount at which the property will be valued and the donor knows that such amount exceeds the [FMV] of the property." *Id.* The foregoing regulation uses the term "a reasonable person" which we read to mean a reasonably informed person without specific knowledge or experience in generally accepted appraisal practices. In other words, the question becomes whether Jackson Crossroads held specific knowledge of facts that would cause it to expect Mr. Fletcher's opinion of value to be falsely overstated. We find there are none in these consolidated cases.

In gauging a partnership's "knowledge" we look to the knowledge of the person(s) with ultimate authority to manage the partnership. *See, e.g.*, *CNT Invs., LLC v. Commissioner*, 144 T.C. 161, 222 (2015) (examining the general partner's knowledge in order to assess "good faith"); *Superior Trading, LLC v. Commissioner*, 137 T.C. 70, 91–92 (2011) (stating that partnership-level defenses take "into account the state of mind of the general partner"), *supplemented by* T.C. Memo. 2012-110, *aff'd*, 728 F.3d 676 (7th Cir. 2013); *J L Minerals, LLC v. Commissioner*, T.C. Memo. 2024-93, at \*38. We have also indicated that the expression "'falsely to overstate' is intended to convey a sense of collusion and deception as to the value of the property." *Kaufman v. Commissioner*, T.C. Memo. 2014-52, at \*70–71, *aff'd*, 784 F.3d 56 (1st Cir. 2015); *see also Mill Road 36 Henry, LLC v. Commissioner*, T.C. Memo. 2023-129, at \*42–43.

Respondent points to facts that were known (or should have been known) by Mr. Walstad (whose knowledge is imputed to the Partnerships as he is the manager of Greencone, which is the managing member of the Partnerships) on the basis of his experience as a real estate professional and his experience with the sale of timber lands. Respondent contends Mr. Walstad introduced Mr. Fletcher to the DCF methodology so as to inflate his appraisal value. Next, respondent contends Mr. Walstad's knowledge—on the basis of other contemporaneous appraisals all performed by Mr. Fletcher— demonstrates his practice of issuing hyperinflated appraisal valuations. In sum, respondent contends Mr. Walstad held knowledge of facts that would cause a reasonable person to expect that he would realize that

[*26] Mr. Fletcher's opinion of value falsely overstates the FMV of the Jackson Crossroads property.

We determine respondent's argument here with respect to the pre-arranged relationship between Messrs. Walstad and Fletcher to be somewhat compelling. The facts show Mr. Fletcher prepared no fewer than four contemporaneous appraisal reports at the direction of Mr. Walstad all for the same purpose; namely, a conservation easement donation. Each appraisal by Mr. Fletcher had an effective date of December 16, 2016, found a hypothetical highest and best use of mining crushed aggregate stone, and contained a before easement FMV of approximately $23.5 million.

These facts, however, could also be read as a relatively normal back-and-forth between client and appraiser. The client first retains someone who has experience and skill with real property valuations and then gives samples of what the client has found appropriate in the past. The client trusts the appraiser to pick an acceptable method and believes that the income method makes sense given the uniqueness of the property. The appraiser, although responsive to feedback, explicitly aims to stay within the bounds of reasonableness.

Petitioner downplays Mr. Walstad and petitioner's relationship to Mr. Fletcher by contending each of those four appraisal reports was for "mineral properties with similar values," and this "consistency confirms the reliability of the Fletcher market analysis later confirmed by [the] Burgex" report. As the trier of fact we observe a witness's candor, sincerity, and demeanor in order to evaluate the testimony and assign it appropriate weight in determining disputed facts. *See Neonatology Assocs., P.A. v. Commissioner*, 115 T.C. 43, 84 (2000), *aff'd*, 299 F.3d 221 (3d Cir. 2002). We are not bound to accept a taxpayer's self-serving testimony. *See Tokarski v. Commissioner*, 87 T.C. 74, 77 (1986); *Hradesky v. Commissioner*, 65 T.C. 87, 90 (1975), *aff'd per curiam*, 540 F.2d 821 (5th Cir. 1976).

On the basis of the record, we do not conclude that a reasonable person with Mr. Walstad's and Greencone's knowledge would expect Mr. Fletcher to falsely overstate the value, nor was there a meeting of the minds on a predetermined result. These cases present a different situation from *Oconee Landing Property, LLC v. Commissioner*, T.C. Memo. 2024-25, at *45, *supplemented by* T.C. Memo. 2024-73, where the donor intimately understood the FMV of the property and reached an implicit agreement with the appraiser as to a value that he knew to be

**[\*27]** false. *J L Minerals, LLC*, T.C. Memo. 2024-93, at \*39. Consequently, we conclude that respondent has failed to establish the applicability of Treasury Regulation § 1.170A-13(c)(5)(ii), and we therefore conclude Mr. Fletcher was a "qualified appraiser." *See* Treas. Reg. § 1.170A-13(c)(5).[12]

C.     *Whether Mr. Fletcher's Appraisal and Mr. Galphin's Appraisal Are Qualified Appraisals*

To be a qualified appraisal under section 170(f)(11)(E) an appraisal of property must be (1) treated as a qualified appraisal under regulations or other guidance prescribed by the Secretary, and (2) conducted by a qualified appraiser in accordance with generally accepted appraisal standards and any regulations or other guidance prescribed by the Secretary.

Treasury Regulation § 1.170A-13(c)(3) defines a qualified appraisal as a document that, among other things (1) relates to an appraisal that is made not earlier than 60 days before the date of contribution of the appraised property and not later than the due date (including extensions) of the return on which a deduction is first claimed under section 170; (2) is prepared, signed, and dated by a qualified appraiser; (3) includes a description of the property appraised, the FMV of the property on the date of contribution, the specific basis for the valuation, a statement that the appraisal was prepared for income tax purposes, the qualifications of the qualified appraiser, and the signature and taxpayer identification number of the appraiser; and (4) does not involve an appraisal fee that violates certain prescribed rules.

The regulation imposes substantive requirements on the content of an appraisal report. *Scheidelman v. Commissioner*, 682 F.3d 189, 198 (2d Cir. 2012), *vacating and remanding* T.C. Memo. 2010-151. A qualified appraisal provides the IRS with sufficient information to evaluate the claimed deduction and to deal more effectively with the prevalent use of overvaluation. *Hewitt v. Commissioner*, 109 T.C. 258, 265 (1997), *aff'd per curiam*, 166 F.3d 332 (4th Cir. 1998) (unpublished table decision).

---

[12] This ruling does not mean that we accept Mr. Fletcher's opinion of FMV or that petitioner did not have reason to question his valuation; we are only ruling that, with respect to the technical meaning of the term "qualified appraiser," he was qualified.

**[*28]** Citing the opinion testimony of Mr. Krasinski, respondent contends Mr. Galphin's appraisal alters data and does not match expected results, his approach to value fails to account for necessary factors, his DCF model is inappropriate and fails to include necessary expenditures, and petitioner fails to offer evidence of substantial compliance or a reasonable cause exception for lack of compliance. Respondent likewise contends Mr. Fletcher's appraisal contains a predetermined value, uses a misleading and flawed valuation model, misleads the reader, and shows lack of due diligence. Petitioner also fails to offer evidence of substantial compliance or a reasonable cause exception for lack of compliance.

In rebuttal to these arguments petitioner argues the appraisals comply with Treasury Regulation § 1.170A-13(c)(3)(ii) contends there was no specific requirement for an appraisal to comply with USPAP until January 1, 2019, and states both Messrs. Galphin and Fletcher held themselves to a higher standard than required at the time the appraisal reports were issued.

Respondent does not seem to contest the appraisals' compliance with Treasury Regulation § 1.170A-13(c)(3)(ii); however, he seeks to disqualify the appraisals as not prepared in accordance with generally accepted appraisal standards including USPAP standards. We address respondent's contention below.

Section 170(f)(11)(E)(i)(II) specifies, in relevant part, that a qualified appraisal must be "conducted by a qualified appraiser in accordance with generally accepted appraisal standards." The Department of the Treasury provided transitional guidance in I.R.S. Notice 2006-96, 2006-2 C.B. 902. According to that Notice an appraisal will meet the specifications of section 170(f)(11)(E) if, for example, "the appraisal is consistent with the substance and principles of [USPAP]." Notice 2006-96, § 3.02(2), 2006-2 C.B. at 902.

USPAP is widely recognized and accepted as setting out standards applicable to the appraisal profession. Adherence to those standards is evidence that the appraiser is applying methods that are generally accepted within the appraisal profession. Therefore, compliance with USPAP is an indication that the appraiser's valuation report is reliable. However, full compliance with USPAP is not the sole measure of reliability. *See Whitehouse Hotel Ltd. P'ship v.*

[*29] *Commissioner*, 131 T.C. 112, 127–28 (2008),[13] *vacated and remanded*, 615 F.3d 321 (5th Cir. 2010).

We generally accept Mr. Krasinski's expert opinion that portions of the appraisals lack full compliance under USPAP; however, we find these failures go to the credibility and weight of the appraisals rather than to whether the appraisals are qualified appraisals. Notwithstanding the highest and best use conclusions reached in the reports we cannot say either report fails to comply with generally accepted appraisal standards. We also accept petitioner's contention that Treasury Regulation § 1.170A-17 is effective only beginning in 2019, and, therefore, its application here is not before us.

In sum, we find that both Mr. Fletcher's appraisal and Mr. Galphin's appraisal satisfy the requirements of section 170(f)(11)(E)(i)(II). Accordingly, we hold that both appraisals are qualified appraisals for purposes of section 170(f)(11).

IV.    *Adjusted Basis Limitation Under Section 170(e)(1)(A)*

In the alternative respondent contends that the charitable contribution deduction for each of the Partnerships is limited to the adjusted basis in each Partnership's respective property under section 170(e)(1)(A) because the properties were inventory items held by Mor-Ton and disposed of within five years, thereby making the properties ordinary (not capital) assets under sections 724(b) and (d)(2), 751(d), and 1221(a)(1).

Petitioner disputes these arguments both procedurally and substantively. First and as a matter of notice, petitioner contends the FPAAs and subsequent pleadings did not assert that section 170(e)(1)(A) applies here. Petitioner further contends that as a factual matter the undeveloped tracts of land held by Mor-Ton as a single asset entity were the antithesis of inventory under sections 724(b) and (d)(2), 751(d), and 1221(a)(1).

Property contributed to a partnership generally retains the same character it had in the hands of the contributing partner. Section 724(b)

---

[13] While this case deals with the admissibility of an expert report rather than whether the report was a qualified appraisal under the Code, we find the case to be illustrative of the subjective nature of appraisals and in stark contrast to the rigid standard of compliance respondent would have this Court adopt, which is something we will refrain from doing here.

**[\*30]** provides that if property is contributed by a partner to a partnership and if the property "was an inventory item in the hands of such partner immediately before such contribution," then "any gain or loss recognized by the partnership on the disposition of such property during the 5-year period beginning on the date of such contribution shall be treated as ordinary income or ordinary loss." Section 724(b) was enacted to prevent a partner from converting "ordinary income property" into capital gain property simply by contributing it to a partnership. *See Jones v. Commissioner*, 560 F.3d 1196, 1199 (10th Cir. 2009), *aff'g* 129 T.C. 146 (2007); *Strasburg v. Commissioner*, T.C. Memo. 2000-94, slip op. at 24 ("The allowable charitable contribution deduction for ordinary income property is limited to the basis of the property donated.").

Section 751(d) defines "inventory items" for section 724(b) purposes to include "property of the partnership of the kind described in section 1221(a)(1)." *See* I.R.C. § 724(d)(2) (incorporating the definition of "inventory item" provided in section 751(d)). Section 1221(a)(1) sets forth an exclusion from the term "capital asset," providing that a capital asset does not include "stock in trade of the taxpayer or other property of a kind which would properly be included in the inventory . . . or property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business." Thus, if the contributing partner holds property primarily for sale to customers in the ordinary course of its trade or business, the property is an "inventory item" in its hands and in the hands of the partnership to which it contributes the property.

Whether a taxpayer holds property primarily for sale to customers in the ordinary course of its business rather than as an investment presents a question of fact. *Pritchett v. Commissioner*, 63 T.C. 149, 162 (1974). The U.S. Court of Appeals for the Eleventh Circuit has explained that this factual question involves three subsidiary inquiries: (1) whether the taxpayer was engaged in a trade or business; (2) whether the taxpayer held the property primarily for sale in that business; and (3) whether the sales thus contemplated were "ordinary" in the course of that business. *Sanders v. United States*, 740 F.2d 886, 888–89 (11th Cir. 1984) (citing *Suburban Realty Co. v. United States*, 615 F.2d 171, 178 (5th Cir. 1980)). Absent stipulation to the contrary this case is appealable to the Eleventh Circuit, and we thus follow its precedent. *See* I.R.C. § 7482(b)(1)(E).

[*31] Petitioner argues the Partnerships acquired the respective tracts of land primarily for conservation purposes and not for the sale to customers. Respondent contends we should look to the actions of Mr. Walstad, Mr. Bennett, and Greencone to determine—on the basis of these individuals' frequency and continuity in acquiring land and practicing in syndicated conservation easements over a period of 13 years—whether we can classify these properties as inventory. While the question is certainly a close call, when we look to the Eleventh Circuit's factual analysis, we find the question principally turns on the actions of the Partnerships and the contributing partner, Mor-Ton, as to these properties. *See Sanders*, 740 F.2d at 888–89. We find it inappropriate to look to the actions of Mr. Walstad, Mr. Bennett, and Greencone to impute a larger or overarching business purpose that would not otherwise exist between the Partnerships and the contributing partner. It is also contrary to our previous holdings on this issue. *See, e.g.*, *Oconee Landing*, T.C. Memo. 2024-25, at *56; *Mill Road*, T.C. Memo. 2023-129, at *54; *Glade Creek Partners, LLC v. Commissioner*, T.C. Memo. 2023-82, at *11–12 (analyzing the actions of the contributing partner, Hawk Bluff).

The Eleventh Circuit has identified several factors that may be relevant in this inquiry: (1) the nature and purpose of the property's acquisition and the duration of the taxpayer's ownership; (2) the extent of the taxpayer's efforts to sell the property; (3) the number, extent, continuity, and substantiality of the sales; (4) the extent of subdividing, developing, and advertising to increase sales; (5) the use of a business office for sale of the property; (6) the degree of supervision exercised by the taxpayer over any broker hired to sell the property; and (7) the time and effort the taxpayer habitually devoted to the sales activity. *Boree v. Commissioner*, 837 F.3d 1093, 1100 (11th Cir. 2016) (citing *United States v. Winthrop*, 417 F.2d 905, 909–10 (5th Cir. 1969)), *aff'g in part, rev'g in part* T.C. Memo. 2014-85; *see Sanders*, 740 F.2d at 889 (applying the so-called *Winthrop* factors).[14] On brief petitioner argues none of the *Winthrop* factors exist in these consolidated cases; we agree.

In *Glade Creek*, T.C. Memo. 2023-82, at *10–11, we explained that the majority of the foregoing seven *Winthrop* factors relate to sales and

---

[14] No single factor or combination of factors is controlling, and "great weight" may be given to other relevant factors where appropriate. *See Boree v. Commissioner*, 837 F.3d at 1105. Each case must be decided on its particular facts. *Biedenharn Realty Co. v. United States*, 526 F.2d 409, 415 (5th Cir. 1976) (citing *Thompson v. Commissioner*, 322 F.2d 122, 127 (5th Cir. 1963), *aff'g in part, rev'g in part* 38 T.C. 153 (1962)).

**[\*32]** marketing of the property, and these factors supported the conclusion that easement property was a capital asset when there were no lot sales. We also gave substantial weight to the contributing partner's reporting of the conservation easement property as inventory on its tax return since we found there to be no motivation for mischaracterizing its tax classification. *Id.* at \*11, \*13. The facts of these consolidated cases, however, are distinguishable.

In these cases petitioner has presented evidence that the Partnerships acquired their respective tracts of land primarily for conservation purposes and not as investment property. In the light of section 724(b) and its purpose we likewise place substantial weight on Mor-Ton's balance sheet reporting of the easement property as "land" and not "inventory" on its return. Furthermore, Mor-Ton's principal member, Greencone, did not purchase and sell property in its own name.

While statements on a return are not conclusive, after considering the absence of the foregoing *Winthrop* factors and tax treatment of the two properties by Mor-Ton, we conclude the properties are capital assets. This conclusion precludes our acceptance of respondent's argument that a section 170(e)(1)(A) basis limitation should apply.

V.      *Fair Market Valuation of the Conservation Easement Donations*

Having determined the Partnerships have satisfied the substantiation requirements of a "qualified conservation contribution" under section 170(h)(1), next we must determine the charitable contribution deduction amounts.

A.      *Valuation Principles*

Generally, the amount of a charitable contribution deduction under section 170(a) for a donation of property is the FMV of the property at the time of the donation. Treas. Reg. § 1.170A-1(c)(1). Treasury Regulation § 1.170A-1(c)(2) defines FMV to be "the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or sell and both having reasonable knowledge of relevant facts." With respect to valuing a donation of a partial interest in property Treasury Regulation § 1.170A-7(c) provides that "[e]xcept as provided in § 1.170A-14, the amount of the deduction under section 170 . . . is the [FMV] of the partial interest at the time of the contribution." Treasury Regulation § 1.170A-14(h)(3)(i) in turn sets forth the following method for valuing a perpetual conservation restriction:

**[\*33]** If there is a substantial record of sales of easements comparable to the donated easement (such as purchases pursuant to a governmental program), the [FMV] of the donated easement is based on the sales prices of such comparable easements. If no substantial record of market-place sales is available to use as a meaningful or valid comparison, as a general rule (but not necessarily in all cases) the [FMV] of a perpetual conservation restriction is equal to the difference between the [FMV] of the property it encumbers before the granting of the restriction and the [FMV] of the encumbered property after the granting of the restriction. The amount of the deduction in the case of a charitable contribution of a perpetual conservation restriction covering a portion of the contiguous property owned by a donor and the donor's family . . . is the difference between the [FMV] of the entire contiguous parcel of property before and after the granting of the restriction.

The FMV of property on a given date is a question of fact to be resolved on the basis of the entire record. *McGuire v. Commissioner*, 44 T.C. 801, 806–07 (1965); *Kaplan v. Commissioner*, 43 T.C. 663, 665 (1965). In these cases we do not have "a substantial record of sales of easements comparable to the donated easement," and we will therefore base our valuation on the before and after method. *See* Treas. Reg. § 1.170A-14(h)(3)(i). Treasury Regulation § 1.170A-14(h)(3)(ii) provides:

If before and after valuation is used, the [FMV] of the property before contribution of the conservation restriction must take into account not only the current use of the property but also an objective assessment of how immediate or remote the likelihood is that the property, absent the restriction, would in fact be developed, as well as any effect from zoning, conservation, or historic preservation laws that already restrict the property's potential highest and best use.

The highest and best use is one that is a "reasonable and probable use that supports the highest present value," with a "focus . . . on 'the highest and most profitable use for which the property is adaptable and needed or likely to be needed in the reasonably near future.'" *TOT Prop. Holdings, LLC v. Commissioner*, 1 F.4th 1354, 1369 (11th Cir. 2021) (quoting *Palmer Ranch Holdings Ltd v. Commissioner*, 812 F.3d 982,

**[\*34]** 987 (11th Cir. 2016)); *accord Olson v. United States*, 292 U.S. 246, 255 (1934). When the parties propose different uses for the property, we are to consider whether there is "too high a chance that the property will not achieve the proposed use in the near future" as causing the use to be too risky to qualify. *TOT Prop. Holdings, LLC v. Commissioner*, 1 F.4th at 1369 (quoting *Palmer Ranch Holdings Ltd v. Commissioner*, 812 F.3d at 1000). Then, after determining a property's highest and best use our task is to arrive at a value based on that use. *Id.* at 1370.[15]

The two methods generally used to determine the "before value" and the "after value" are the comparable sales[16] and income methods. The comparable sales method looks at arm's-length transactions that involved properties similar to the subject property and occurred within a reasonable time of the valuation date. *See, e.g.*, *Wolfsen Land & Cattle Co. v. Commissioner*, 72 T.C. 1, 19 (1979); *Butler v. Commissioner*, T.C. Memo. 2012-72, slip op. at 38. The income approach projects the future cashflows the property will generate at its highest and best use. *See, e.g.*, *Butler*, T.C. Memo. 2012-72, slip op. at 39; *Trout Ranch, LLC v. Commissioner*, T.C. Memo. 2010-283, slip op. at 9–10, *aff'd*, 493 F. App'x 944 (10th Cir. 2012). This method assumes that an investor would pay no more than the present value of the property's anticipated future income. *Butler*, T.C. Memo. 2012-72, slip op. at 39.

To show the value of the two conservation easements including the highest and best use before and after the donations of the properties the parties have offered the reports and testimony of expert witnesses. *See* Rule 143(g). "Opinion testimony of an expert is admissible if and

---

[15] "The highest and best use inquiry is one of objective probabilities." *Esgar Corp. v. Commissioner*, 744 F.3d 648, 657 (10th Cir. 2014), *aff'g* T.C. Memo. 2012-35. "While highest and best use can be any realistic, objective potential use of the property, it is presumed to be the use to which the land is currently being put absent proof to the contrary." *Esgar*, T.C. Memo. 2012-35, 2012 WL 371809, at \*7. Where "an asserted highest and best use differs from current use, the use must be reasonably probable and have real market value." *Id.* (citing *United States v. 69.1 Acres of Land*, 942 F.2d 290, 292 (4th Cir. 1991)).

[16] *Estate of Rabe v. Commissioner*, T.C. Memo. 1975-26, 34 T.C.M. (CCH) 117, 119 ("In the case of vacant, unimproved property the 'market data' or 'comparable sales' approach is generally the most reliable method of valuation, the rationale being that the marketplace is the best indicator of value, based on the conflicting interests of many buyers and sellers. This in turn is based on the principle of substitution, i.e., that a prudent man will pay no more for a given property than he would for a similar property. This method requires gathering information on sales of property similar to the subject property, then comparing and weighing them to reach a likely value for the land being appraised."), *aff'd*, 566 F.2d 1183 (9th Cir. 1977) (unpublished table decision).

[*35] because it will assist the trier of fact to understand evidence that will determine a fact in issue," and we evaluate expert opinions "in light of the demonstrated qualifications of the expert and all other evidence of value." *Parker v. Commissioner*, 86 T.C. 547, 561 (1986) (citing Fed. R. Evid. 702). Where experts offer competing estimates of FMV we decide how to weight those estimates by, among other things, examining the factors they considered in reaching their conclusions. *See Casey v. Commissioner*, 38 T.C. 357, 381 (1962). We are not bound by the opinion of any expert witness, and we may accept or reject expert testimony in the exercise of our sound judgment. *Helvering v. Nat'l Grocery Co.*, 304 U.S. 282, 294–95 (1938); *Estate of Newhouse v. Commissioner*, 94 T.C. 193, 217 (1990). We may also reach a decision as to the FMV of a property on the basis of our own examination of the evidence in the record. *See Silverman v. Commissioner*, 538 F.2d 927, 933 (2d Cir. 1976), *aff'g* T.C. Memo. 1974-285.

With these principles in mind, we will now explain our valuation of the conservation easements, i.e., the FMVs of the Partnerships' properties.

B.  *Valuation Analysis*

Petitioner's valuation experts used a DCF analysis, which is a subset of the income approach, and the comparable sales method to value the Jackson Crossroads property both before and after easement. Petitioner's valuation experts arrived at several before easement FMVs of the property which ranged from $23.5 million as concluded by Mr. Fletcher and $9.4 million as concluded by Mr. Kenny and assumed the property's highest and best use as an industrial site. While respondent's valuation expert concluded that the Jackson Crossroads property's FMV before easement was no more than $1.6 million.

The large disparity in the parties' FMVs for the Jackson Crossroads property lies in their disagreement as to the highest and best use of the property at the time of donation, whether the DCF method should be used, as well as the comparable sales used in their respective analyses. Therefore, we must determine the highest and best use of the Jackson Crossroads property before easement and whether the DCF method and/or the comparable sales method was appropriate.

With respect to Long Branch the dispute is somewhat different. Both parties' expert witnesses used the sales comparison approach but arrived at FMVs with significant differences. Petitioner's expert valued

**[*36]** the Long Branch property before easement at $45,000 per acre; respondent's expert found the property was worth $7,000 per acre. Therefore, as with the Jackson Crossroads property we must determine the highest and best use of the Long Branch property; this in turn will drive our decision as to which properties are the best comparables for arriving at a before easement FMV.

Notably, the relevant expert witnesses for both parties used the sales comparison approach to conclude an after easement FMV for each of the Partnerships' properties. However, petitioner contends the FMVs are $1,883 per acre, and respondent contends the FMVs are $2,000 per acre. Therefore, we must also determine the after easement FMVs for these properties.

C.    *Highest and Best Use Determinations*

   1.    *Whether the Proposed Developments Are Physically Possible and Legally Permissible*

There appears to be no genuine dispute that an aggregate mine at the Jackson Crossroads property is physically and legally possible. Both parties agree that granitic gneiss existed on this property and that rezoning of the property was a strong possibility. Accordingly, we will accept that an aggregate mine at the Jackson Crossroads property was a physical and legal possibility.

However, the parties do dispute the development of the Long Branch property and alternatively the Jackson Crossroads property as an industrial site for warehousing and/or manufacturing. Mr. Macgregor's conceptual design plan for a proposed industrial development at the Long Branch property was just that—a conceptual design with few details furnished.

One of the most glaring oversimplifications in the plan to develop the Long Branch property relates to gaining access to the Long Branch property from Dixie Highway, after considering the CSX railway servitude, by either an at-grade railroad crossing or by a grade-separated crossing. Furthermore, the proposed rail access or "rail spur" access for commercial and industrial use offered by petitioner's experts was devoid of professional engineering, making the benefits of these designs very limited. It is anything but a foregone conclusion that CSX would in fact grant commercial access to the Long Branch property by either a newly constructed railway spur or highway access by a graded or nongraded rail crossing.

[*37] We find the evidence offered by respondent's expert witness Harvey Crouch regarding railway engineering compelling. Mr. Crouch first testified as to the complexity involved in obtaining rail access at the Long Branch property for industrial use as well as a potentially cost prohibitive expense of $2.3 million to build a separate bridge crossing which may be required by CSX for commercial trucks to access the property from the highway. Petitioner did provide evidence from Mr. Forbes establishing that the Long Branch property could be developed for industrial purposes because of nearby utilities including water, sewer, and electricity. Mr. Forbes, however, also acknowledged that a "deeper review into the potential development of the property" would be needed since his report was only a "desktop review" of the Long Branch property.

After considering the development costs and uncertainty of whether trucks could gain access to the Long Branch property from Dixie Highway, we question whether development of the Long Branch property as an industrial site is physically or legally possible. However, even if we accept that the proposed development was both physically and legally permissible, we must also determine whether the proposed development was financially feasible and maximally productive.

2. *Whether the Proposed Developments Are Financially Feasible and Maximally Productive*

In support of their respective positions on the value of the two conservation easements the parties presented evidence which mainly consists of expert witness testimony.

We conclude petitioner's arguments and evidence do not support a conclusion that the Jackson Crossroads property's highest and best use is as a hypothetical aggregate mine. We reject Mr. Proctor's general conclusion that there is an unmet demand for some 16 million tons of aggregate based on the total number of residents within the greater Atlanta metropolitan area and an estimated demand for aggregate within this general area. We similarly do not accept Mr. Black's conclusion that we have sufficient information on the basis of preliminary drilling and market analysis to determine whether a mineral reserve[17] exists. We find the more conservative rebuttal evidence offered by respondent's experts, namely, Messrs. Tracy and

---

[17] *See supra* note 7 and pp. 11, 14 (discussing the difference between mineral resources and reserves).

**[*38]** Gunesch, to be convincing. Mr. Gunesch testified that as a base scenario some 300,000 tons of aggregate could feasibly be mined annually at the Jackson Crossroads property, which would result in a negative cashflow and would make aggregate mining financially unfeasible. In sum we find there is insufficient evidence to support a finding that an aggregate mine at the Jackson Crossroads property is a financially feasible and maximally productive use of this property.

Turning to the Long Branch property, and as an alternative use for the Jackson Crossroads property, the record is conflicting as to the feasibility of using the properties for industrial (e.g., warehousing or manufacturing) purposes. On the one hand petitioner contends the properties are well positioned for industrial development considering their proximity to other industrial mega sites. Respondent offered rebuttal evidence from Ms. Smith in which she opined that development was impractical because of both lack of market demand and infeasibility. As referenced above we find that market feasibility and rail access to the property appear speculative after considering the testimony from Mr. Crouch who opined that gaining railway access would cost between $14 million and $17 million.

Considering Mr. Norton's market study report, we conclude petitioner has failed to carry its evidentiary burden. Mr. Norton's findings are general, and we do not find his conclusions to be supported by the facts presented. Mr. Norton was unable to provide sources for much of his analysis and his conclusions; or when he did provide sources, they were either generic or high-level sources (e.g., the U.S. Census Bureau, greater Atlanta regional statistics). When Mr. Norton was specific, he discussed Newton County and the economic development of new manufacturing projects in that county, rather than Morgan and Walton Counties. Mr. Norton did later make a case for future industrial growth in Morgan and Walton Counties on the basis of the Joint Development Authority and the two properties' proximity to industrial mega sites such as Georgia Historic Heartland, Stanton Springs, Social Circle, and East Atlanta. The only specific industrial development he cites to in his report is the Rivian manufacturing plant located on the East Atlanta mega site, which was developed well after 2016.

While Mr. Norton's opinions do seem to support the general conclusion that there is need for future industrial sites, including either manufacturing or large warehousing, there is also support for the inverse conclusion; namely, that there is no significant demand for

**[*39]** development. We conclude that Mr. Norton's opinions are subjective and not well supported.

We find Ms. Smith's opinions and analysis to be well supported. Her opinions were far more specific to the region and included Morgan, Walton, and Newton Counties. Ms. Smith used the population projections prepared by the University of Georgia Carl Vinson Institute of Government and other data relating to warehouse and distribution centers inventory and performance trends from 2007 to 2016. This cited data supports her conclusion that the proposed development at Long Branch consisting of over 3 million square feet of warehouse and distribution space would need to capture 118% of the primary market's total new industrial space inventory growth through year 2036 and some 58% of the secondary market's total new industrial inventory growth over some 20 years. Ms. Smith concluded the proposed development at the Long Branch property was speculative and did not reconcile with historical data, including anticipated growth, and, therefore, was well beyond market threshold and what could reasonably be inferred from an objective assessment of data. In her rebuttal Ms. Smith stated she viewed Mr. Norton's report more as a "marketing report or brokers report."

Although we do find some evidence pointing in favor of the potential development of the Partnerships' properties as industrial sites, we ultimately determine the record is insufficient to conclude that the proposed development of these properties as industrial sites was both financially feasible and maximally productive. As is, there is simply "'too high a chance that the property will not achieve the proposed use in the near future,' in which case 'the use is too risky to qualify.'" *TOT Prop. Holdings, LLC c. Commissioner*, 1 F.4th at 1369 (quoting *Palmer Ranch Holdings Ltd v. Commissioner*, 812 F.3d at 1000). The highest and best use of the Partnerships' properties accordingly remains their current agricultural/residential/recreational use with knowledge of minerals on the properties and the opportunity to seek entitlements allowing mining for the Jackson Crossroads property.

D.     *"Before" FMV of the Properties*

1.     *Legal Framework*

Unsurprisingly, "[t]his Court has repeatedly affirmed that actual arm's-length sales occurring sufficiently close to the valuation date are the best evidence of value, and typically dispositive, over other valuation

[*40] methods." *Buckelew Farm, LLC v. Commissioner*, T.C. Memo. 2024-52, at *56; *see also ES NPA Holding, LLC v. Commissioner*, T.C. Memo. 2023-55, at *14; *Excelsior Aggregates*, *LLC v. Commissioner*, T.C. Memo. 2024-60, at *31 ("The best evidence of a property's FMV is the price at which it changed hands in an arm's-length transaction reasonably close in time to the valuation date."); *Corning Place Ohio, LLC v. Commissioner*, T.C. Memo. 2024-72, at *28. Both this Court and the Eleventh Circuit have "f[ou]nd the purchase [of a partnership interest] reflective of the price that the market would pay for the Subject Property, especially when the ownership interest was nearly 100% and the only asset held by the Partnership was the Subject Property itself." *Buckelew Farm*, T.C. Memo. 2024-52, at *56; *see also TOT Prop. Holdings, LLC v. Commissioner*, 1 F.4th at 1368 (finding that the sale price for a 98.99% interest in a partnership whose only meaningful asset was property on which an easement was granted shortly thereafter was representative of the "before" value of the property); *Oconee Landing*, T.C. Memo. 2024-25, at *71–72.

In addition to previous sales, we often draw on one or more of three common approaches to determine the FMV of a piece of real property: (1) the market, or comparable sales, approach; (2) the income approach; and (3) a cost, or an asset-based, approach. *See, e.g., Excelsior Aggregates*, T.C. Memo. 2024-60, at *32; *see also Bank One Corp. v. Commissioner*, 120 T.C. 174 (2003), *aff'd in part, vacated in part, and remanded on another issue sub nom. J.P. Morgan Chase & Co. v. Commissioner*, 458 F.3d 564 (7th Cir. 2006). Our decision on which approach (or approaches) to use is a question of law, and the utility of the various approaches can depend on the type of property at issue. *See Chapman Glen Ltd. v. Commissioner*, 140 T.C. 294, 325–26 (2013); *see also Corning Place*, T.C. Memo. 2024-72, at *31; *Savannah Shoals, LLC v. Commissioner*, T.C. Memo. 2024-35, at *35.

2.      *"Before" FMV Analysis*

a.      *Actual Transactions Involving the Properties*

Mr. Walstad entered into two separate purchase agreements to acquire the Partnerships' two properties in October 2015 for a total price of $5.2 million. Upon assignment of these purchase agreements, Mor-Ton acquired these tracts consisting of 925.63 acres on November 16, 2015. Third-party financing was used to acquire these properties, which included a bank appraisal confirming the value of these tracts to be $5.2 million collectively. These transactions result in a per-acre price

[*41] of $5,600 and offer persuasive evidence of a before easement value for both the Partnerships' properties.

b.     *Income and Comparable Sales Approaches*

In 2016 both properties were zoned for agricultural and limited residential use. Having rejected the premise that the highest and best use of the Jackson Crossroads property was as an aggregate mine, we similarly reject the use of the DCF income method to value this property as presented by Messrs. Fletcher and Kenny. We accept Mr. Sheppard's testimony that it is most appropriate to include only the value of the unentitled land and not the "going concern" value of a hypothetical aggregate mine at the Jackson Crossroads property.

Rather, we find the evidence presented by Mr. Sheppard using the sales comparison approach to value to be compelling for both the Partnerships' properties. Mr. Sheppard's analysis identifies five properties within neighboring counties as comparable properties, and he concludes these properties support an estimated value of $7,000 per acre, resulting in a rounded value of $1.7 million for the Jackson Crossroads property and $2.15 million for the Long Branch property. Below is our analysis of these five properties utilized by Mr. Sheppard.

i.     *Comparable Property Sale #1*

Mr. Sheppard's first selected comparable property is located at 1040 Alcova Drive, Social Circle, in Walton County, Georgia, and consists of 387 acres. While the property transfer occurred after December 2016, Mr. Sheppard deemed the property comparable since Mr. Walstad completed the purchase and the purchase occurred in December 2017. The property was later subdivided into two parcels, and conservation easements were granted on the property. The property had some superior traits including dual road frontages and more wooded areas for timber in comparison to both the Partnerships' properties. The sale of this comparable property provides an indication of FMV before adjustments of $7,751 per acre and an FMV after adjustments made by Mr. Sheppard of $8,112 per acre.

ii.     *Comparable Property Sale #2*

Mr. Sheppard's second selected comparable property is located at 12501 Highway 279, Newton Ridge, in Newton County, Georgia, and consists of 205.5 acres. The transfer of this property, like that of the first property, occurred in September 2017 after the relevant transaction

[*42] date; however, Mr. Sheppard deemed the property sale contemporaneous. The property had some superior traits including highway access and a nearby interstate exchange in comparison to both the Partnerships' properties. The sale of this comparable property provides an indication of FMV after adjustments made by Mr. Sheppard of $6,260 per acre.

### iii.     *Comparable Property Sale #3*

Mr. Sheppard's third selected comparable property is located at 450 James Huff Road, Monroe, in Walton County, Georgia, and consists of 226.77 acres. The transfer of this property occurred in September 2016 shortly before the relevant transaction date. The property had some superior traits including location and proximity to industrial developments and dual road frontage; however, it lacked similar land clearing and rail frontage in comparison to both the Partnership's properties. The sale of this comparable property provides an indication of FMV before adjustments of $7,827 per acre and an FMV after adjustments made by Mr. Sheppard of $7,073 per acre.

### iv.     *Comparable Property Sale #4*

Mr. Sheppard's fourth selected comparable property is located at 2543 Davis Academy Road, Rutledge, in Morgan County, Georgia, and consists of 185.25 acres. The transfer of this property occurred in August 2015 before the relevant transaction date. The property had some superior traits including nearby interstate access; however, it lacked rail frontage. Overall, this property was in a more rural location, being farther east and farther from metropolitan development in comparison to both the Partnership's properties. The sale of this comparable property provides an indication of FMV before adjustments of $5,772 per acre and an FMV after adjustments made by Mr. Sheppard of $6,413 per acre.

### v.     *Comparable Property Sale #5*

Mr. Sheppard's fifth selected comparable property is located at 1945 Seven Islands Road, Buckhead, Georgia, and consists of 487.24 acres. The transfer of this property occurred in November 2015 before the relevant transaction date. The property had some superior traits including location and proximity to interstate access; however, it was in an inferior location which was east and farther removed from metropolitan development in comparison to both the Partnerships' properties. This comparable property was the largest tract. This sale

[*43] provides an indication of FMV before adjustments of $3,750 per acre and an FMV after adjustments made by Mr. Sheppard of $4,356 per acre.

Here is a map of comparable properties found in Mr. Sheppard's report:



After considering the five comparable property sales selected by Mr. Sheppard, we find them to be a representative sample of comparable property sales. Ultimately, he arrived at an indication of FMV of $7,000 per acre and a highest and best use of agricultural/residential/ recreational use with knowledge of minerals on the properties and the opportunity to seek entitlements allowing mining.

Petitioner has also presented evidence from both Messrs. Galphin and Kenny, who used the sales comparison approach to value the Long Branch property; however, their comparable properties consist solely of industrial properties. Mr. Galphin's sales of comparable properties include seven sales throughout the Atlanta metro region which ranged in price from $35,049 to $92,172 per acre for tracts of land ranging from 53 to 203 acres.

[*44] Here is a map of Mr. Galphin's comparable properties:

COMPARABLE UNENCUMBERED LAND SALES LOCATION MAP

After adjustments Mr. Galphin provided an indication of FMV of $55,000 per acre. We find Mr. Galphin to be knowledgeable and experienced in the marketplace. However, none of his selected properties appear to be comparable; they were all smaller in acreage, zoned industrial, and scattered throughout the Atlanta metro region, and had superior access to utilities compared to the Long Branch property. His overall conclusions were also predicated on the extraordinary assumption that the Long Branch property was zoned for industrial use and would have experienced future industrial development because of its proximity to other industrial sites. Accordingly, we will reject Mr. Galphin's conclusion of FMV as not well supported.

**[*45]** Mr. Kenny likewise used the sales comparison approach to perform a retroactive FMV determination for the Long Branch property. Mr. Kenny's comparable property sales include four sales throughout the Atlanta metro region which ranged in price from $26,640 to $86,250 per acre for tracts of land ranging from 62 to 183 acres.

Here is a map of Mr. Kenny's comparable properties:



We find Mr. Kenny, like Mr. Galphin, to be generally knowledgeable in the value of raw land. However, none of his sales seem to involve comparable properties since they are far from the subject property and scattered throughout the Atlanta metropolitan area. They are also smaller with three of his four being zoned for industrial use. We also find his overall conclusion regarding the Long Branch property's highest and best use to be conclusory and predicated upon Mr. Norton's report which we have rejected. Accordingly, we also reject Mr. Kenny's conclusion of FMV.

On the basis of Messrs. Fletcher's, Galphin's, and Kenny's opinions on FMV, petitioner seeks affirmation of the originally claimed before easement FMVs of $23,584,336 and $14,600,000 by Jackson Crossroads and Long Branch, respectively. However, the evidence presented plainly does not support these FMVs claimed.

Respondent seeks an FMV of the conservation easements of no more than $1,140,000 for the Jackson Crossroads property and

**[\*46]** $1,535,000 for the Long Branch property—on the basis of Mr. Sheppard's opinion on FMV.[18] As previously discussed, we are not inclined to conclude that the highest and best use of the Jackson Crossroads and Long Branch properties is mining and/or industrial use. Rather, we conclude that the highest and best use of these properties before the conservation easement donations remained agricultural/residential/recreational use with knowledge of minerals on the properties and the opportunity to seek entitlements allowing mining. Petitioner has not presented evidence (alternative or otherwise) in support of an FMV with an agricultural/residential/recreational use and knowledge of minerals on the site with the opportunity to seek entitlements allowing mining for either property.

After considering all of the evidence presented, we conclude the most appropriate before easement FMVs for the Jackson Crossroads and Long Branch properties are $7,000 per acre or $1,600,270 and $2,149,420, respectively.

### 3. *"After" FMV Analysis*

Petitioner presented evidence from Messrs. Fletcher, Galphin, and Kenny, who used the sales comparison approach to value both of the Partnerships' properties after the conservation easements were in place.

Mr. Fletcher used the sales comparison approach to calculate an after easement FMV of $1,933.05 per acre. Mr. Galphin analyzed six comparable properties ranging from 107 to 1,412 acres of encumbered conservation easement tracts and reached an FMV of $2,500 per acre. Mr. Kenny analyzed six comparable properties ranging from 64 to 242.49 acres of encumbered conservation easement tracts and reached an FMV of $1,200 per acre. Similarly, Mr. Sheppard analyzed five encumbered conservation properties ranging from 104.72 to 205.57 acres and opined an FMV of $2,000 per acre.

Respondent seeks an after easement FMV of $460,000 for the Jackson Crossroads property and $615,000 for the Long Branch property. Petitioner seeks an after easement FMV of $1,883 per acre on

---

[18] On brief respondent prays that this Court find the CE values are not to exceed $4,986.66 and $4,999.02, per acre, for the Jackson Crossroad and Long Branch properties, respectively. We therefore conclude, after rounding, the before FMV value being sought by respondent is $7,000 an acre for the Jackson Crossroad and Long Branch properties.

**[\*47]** the basis of the average of the FMVs reached by Messrs. Fletcher, Galphin, Kenny, and Sheppard.

After considering all of the evidence presented, we find petitioner's average price per acre to be well supported and determine the most appropriate after easement FMV for the Jackson Crossroads and Long Branch properties is $1,883 per acre or $430,473 and $578,194, respectively.

VI.    *Penalties*

Respondent asserts 40% penalties under section 6662(e) and (h) for gross valuation misstatements.[19]

The Code imposes a penalty for "the portion of any underpayment [of tax] which is attributable to . . . [a]ny substantial valuation misstatement." I.R.C. § 6662(a), (b)(3). A misstatement is "substantial" if the value of the property claimed on a return is 150% or more of the correct amount. I.R.C. § 6662(e)(1)(A). The penalty is increased to 40% in the case of a "gross valuation misstatement." I.R.C. § 6662(h). A misstatement is "gross" if the value of property claimed on the return exceeds 200% of the correct amount. I.R.C. § 6662(h)(2)(A)(i).

Since the claimed deduction of $23,142,421 for Jackson Crossroads exceeds 200% ($1,169,797 × 200% = $2,339,594) of the amount determined to be the correct amount of the valuation, we find that the valuation for Jackson Crossroads is a gross misstatement. And we find the same for the original claimed valuation of $13,830,000 for Long Branch. These findings trigger application of 40% gross valuation misstatement penalties under section 6662(e)(1)(A) and (h) to those portions of the underpayments attributable to values claimed that exceed the values determined here.[20]

---

[19] Respondent also asserts section 6662(a) and (b)(1) and (2) accuracy-related penalties for negligence or disregard of rules or regulations and a substantial understatement of income tax on the parts of the underpayments attributable to the Partnerships' noncompliance with substantive and reporting requirements, i.e., the parts of the deductions up to the properties' FMVs. Because we find that the Partnerships complied with the reporting requirements, these penalties are not applicable.

[20] Respondent also seeks a 20% penalty for any underpayment due to a reportable transaction understatement arising from conservation easements' being a listed transaction. *See* I.R.C. § 6662A. However, in *Green Valley Investors, LLC v.*

**[\*48]** Generally, an accuracy-related penalty is not imposed if the taxpayer demonstrates "reasonable cause" and shows that he "acted in good faith with respect to [the underpayment]." I.R.C. § 6664(c)(1). This defense may be available where a taxpayer makes a "substantial" valuation overstatement with respect to charitable contribution property. See I.R.C. § 6664(c)(3) (second sentence). But this defense is not available where the overstatement is "gross." *See* I.R.C. § 6664(c)(3) (first sentence). Consequently, we will sustain the 40% gross valuation misstatement penalties imposed by respondent, and we do not need to address any potential reasonable cause defense since none could apply to this penalty. *See* I.R.C. § 6664(c)(3); *Chandler v. Commissioner*, 142 T.C. 279, 293 (2014).

VII.  *Conclusions*

For tax year 2016 we hold Jackson Crossroads is entitled to claim a charitable contribution deduction under section 170 of $1,169,797 for its donation of a conservation easement over 228.61 acres to Oconee Trust. We further hold for tax year 2016 Long Branch is entitled to claim a charitable contribution deduction under section 170 of $1,571,226 for its donation of a conservation easement over 307.06 acres to Oconee Trust.

With respect to penalties, we hold that the Partnerships are each liable for 40% gross valuation misstatement penalties under section 6662(h)(1) and (2)(A)(i) for those portions of the underpayments attributable to values claimed which are greater than the determined values.

We have considered all of the arguments that the parties have made, and to the extent they are not addressed herein, we find the arguments to be moot, irrelevant, or without merit.

To reflect the foregoing,

*Decisions will be entered under Rule 155.*

---

*Commissioner*, 159 T.C. 80 (2022), we set aside I.R.S. Notice 2017-10, 2017-4 I.R.B. 544 (the notice making conservation easements a listed transaction) as invalid since it was not promulgated pursuant to the Administrative Procedures Act. Since Notice 2017-10 has been set aside—and notwithstanding the fact that gross valuation misstatement penalties apply here—we refrain from imposing reportable transaction understatement penalties in these consolidated cases.